IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America

       Plaintiff,                  Case No. 3:19-cr-403

       v.                            **AMENDED ORDER**

Marlon D. Grant,

       Defendant.

This is a criminal case in which the grand jury indicted the defendant Marlon D. Grant, and two codefendants with drug offenses. Pending is his motion to suppress six search warrants issued *seriatim* (Doc. 20) which the government opposes. (Doc. 21).

Sandusky Police Department Detective Ronald Brotherton obtained all six *seriatim* warrants on the same day, March 2, 2019. (Doc. 21, Exh. 1-6). The first four were for 501 Tiffin Avenue, Sandusky, where Grant rented a store front and a rear apartment. (Doc. 21, Exh. 1-4). The last two were for Grant's residence, which also had a store, at 1001 Monroe St., Sandusky, Ohio. (Doc. 21, Exh. 5, 6).[1]

---

[1] The warrants in this case resulted from an investigation in which it appears that federal DEA Agents quartered in Toledo were actively involved. The same appears to have been true in two other cases assigned to me, and in which defense challenges to the adequacy of warrants, obtained like the one in this case, from the Sandusky Municipal Court. *United States v. Nicholson*, Case No. 3:19-cr-392, and *United States v. Swain*, Case No. 3:19-cr-265.

In *Nicholson,* moreover, the affidavit indicated, without elaboration, simply that Title III surveillance had been a feature in the investigation. Given the fact that, as I learned coincidentally while doing some entirely unrelated work, that Toledo DEA Agents were the affiants for and officers executing an electronic surveillance order issued by an Ohio Common Pleas Judge, *see State v. Nettles*, --- Ohio St. 4th ---, 2020 WL 1056825 (Ohio, 2020), thereby bypassing

After Det. Bretherton obtained the first warrant, officers began its execution. Det. Bretherton returned from time to time to the Municipal Court for the other five warrants.

The affidavits for the first four warrants were duplicates. The affidavits for the last two repeated the contents of the first four affidavits. They also stated that officers had: 1) found crack, suspected crack cocaine, marijuana, and firearms at 501 Tiffin; and 2) located Grant at 1001 Monroe and arrested him.

The defendant argues that the affidavits for all six warrants lack probable cause and are overbroad. The government disputes these contentions and argues that, in any event, the good faith exception applies.

For the reasons that follow, I find that there was probable cause for each of the warrants and that they were not overbroad. Had I found otherwise as to either, I would have applied the good faith exception.

Accordingly, I overrule the motions to suppress.

---

review by the U.S. Attorney's Office, submission for requisite approval by the Attorney General of the United States, or an authorized designee, *see* 18 U.S.C. § 2506(1), and issuance by an Article III United States District Judge.

I suggest that the United States Attorney undertake to ascertain whether the surplice order in *Nicholson* was, as it should have been, a federal order, or, as it should not have been, a State order. Federal officers being involved in investigations that, when it is not necessary to do so, lead to local search warrants is bad enough. Federal agents on their own obtaining and executing state court electronic surveillance orders is worse by orders of magnitudes.

If federal agents want suspects to do the hard time of federal sentences, they should not forego the rigorous vetting that AUSAs give to every application and affidavit for search warrants. Nor should they avoid, as they did in this case, *Swain* and *Nicholson,* the careful, deliberate, informed, experienced, time-consuming and thorough review that our Magistrate Judges undertake. And under no circumstances, as happened in *Nettles, supra,* should any Federal Agent bypass, or be allowed to bypass review by and authorization from the Office of the United States Attorney General and submission of applications for electronic surveillance orders to a United States District Judge.

This Court and the citizens of Northwest Ohio deserve and *expect* better. Federal law enforcement officers are sworn to preserve, protect, and defend the Constitution and laws of the United States. That being so, they should *willingly and proudly* subject themselves to that Constitution and those laws before Federal District and Magistrate Judges. Better to do that at the outset than to be called on during suppression hearings to justify oneself and one's actions to a Federal Judge.

## Background

The duplicative affidavits that Det. Bretherton presented as to the first four warrants related principally to a confidential source CS 1's controlled buy of crack cocaine from Grant.

Detective Bretherton began his narrative of those events by stating that: 1) around the end of May or early June, 2018, Task Force Officer DEA Agent/SPD Officer Adam West had learned that Grant was supplying large amounts of cocaine in Sandusky. Next, on February 1, 2019, CS 1 had told officers that he could get fourteen grams of crack cocaine from Grant.

On March 20th, officers fitted CS 1 with a concealed recording unit. CS 1 called Grant on his cell phone; they had a drug-related conversation. Thereafter, officers gave CS 1 $700 buy-money. In the meantime, officers saw Grant leave his residence at 1001 Monroe St., Sandusky and go to 501 Tiffin Avenue.

Grant and CS 1 had a further phone call, in which Grant told CS 1 that crack cocaine was in a potato chip bag on the informant's front steps. The informant retrieved the bag and gave it to the officers, along with the $700 buy-money they had given him - Grant had agreed during a phone call to get back with CS 1. (Doc. 20, Exh. 1 ¶¶ 5-21, PageID 225).

The next day, March 21, 2019, again while wired, CS 1 went to Grant's residence at 1001 Monroe St. Grant was not there. CS 1 called Grant, who told him to put the $700 (which officers, presumably, had given back to CS 1) in the console of his van (a white Ford Windstar). CS 1 did so.

Officers surveilled Grant driving a BMW to 1001 Monroe St. He parked, got into the passenger side of the Windstar, then got out and got into and out of a white Buick Park Avenue (registered, like the BMW and Windstar, to Grant). Grant drove to and parked the Windstar at 501 Tiffin Avenue.

CS 1 spoke with Grant, who told him he had gotten the buy-money. (*Id.,* ¶¶ 22-34).

Detective Brotherton's affidavit stated that he and a fellow officer had seen Grant "numerous" times drive to 501 Tiffin Ave., park in the rear, enter the building, and leave shortly thereafter. This sort of behavior, according to the affiant, "is indicative of narcotics traffickers," who often use "secondary locations," [in common parlance, a "stash house"] like Grant's "to store and protect their products." (*Id.,* ¶¶ 25-37, PageID 226).

On checking with the owner of 501 Tiffin Avenue, the affiant learned that Grant rented the front store and rear apartment. (*Id.* ¶ 38, PageID 226). Grant had a conviction for attempted trafficking in 2000 and a domestic violence charge reduced to a lesser offense. (*Id.,* ¶ 38, PageID 226).

Based on Det. Bretherton's training and experience, the affidavit lists items that drug dealers commonly use and keep at locations such as 501 Tiffin Avenue. (*Id.,* ¶¶ 39-59, PageID 227-29). The warrant did not incorporate that list *in toto*. *See* Doc 21, Exhs. 1, 2, pp. 1-2; Exhs. 3, 4, pg. 1).[2]

In support of the last two search warrants – for 1001½ Monroe St., Det. Bretherton's affidavits, as noted, duplicated the affidavits for 501 Tiffin. They added facts they learned while executing searches at 501 Tiffin.

The affidavit stated that officers had located Grant at the Monroe St. premises. They arrested him for possession of firearms and drugs they had found at 501 Tiffin. He admitted the guns were his.

---

[2] The first two Tiffin Avenue warrants listed the things to be seized in seven numbered paragraphs. The last two for that address and the two for Monroe St. condensed the list into a single bulky, run-on paragraph. In essence, each form authorizes searches for and seizures of a large array of items. Though different in format, the two versions were substantially similar in content.

The officers asked him if he had weapons, drugs, or U.S. currency. He admitted having "a few" dollars. He showed them where the currency was; it amounted to $6,000. He was searched incident to his arrest. (*Id.*, Exh. 5, ¶ 42, PageID 179).

There followed the same list of items that Det. Bretherton had stated in the earlier affidavits were those, on the basis of his training and experience and drug investigation, that drug dealers commonly used and kept. (*Id.,* ¶ 44, PageID 179).

The two Monroe St. warrants repeated the condensed version from the third and fourth Tiffin Avenue warrants of that list in their authorization of the things for which the officers could conduct their searches and seizures. *See* Doc. 21, Exh. 5, 6, pg. 1.

## Discussion
## 1. Probable Cause

In determining whether an affidavit for a search warrant provides probable cause sufficient to justify the warrant's issuance, I do not engage in *de novo* review. *Illinois v. Gates,* 462 U.S. 213, 236 (1983). I am, rather, to give deference to the issuing judge's probable cause finding. *Id*. My duty in review is to ensure that the issuing magistrate had a substantial basis for concluding that probable cause existed. *Id.*

Applying these factors, I have no hesitation in concluding that the affidavits showed probable cause that Grant was a drug dealer: the CS's controlled buys are direct evidence to that effect.

As did the defendant's evasive avoidance of direct hand-to-hand dealing. His clever use of his Windstar, as if it were a spy's "dead drop" or "dead letter box," did not, however, successfully conceal what was going on. It was also apparent that he was no dime-bag dealer: officers had seen him driving three different cars, all registered in his name, and none that seemed Craigslist cheap.

In addition to probable cause as to Grant's activities, the affidavits also provided probable cause as to both premises. Just as 501 Tiffin was likely to hold drugs, firearms, and related paraphernalia, the same was true with regard to 1001½ Monroe. As to those premises, this was particularly true for items not needed for "retail sales" of drugs from Tiffin Avenue, such as books and records, whether kept on paper or digitally; related documents, such as leases, bills, and receipts for both locations and evidence of receipt of incoming drug shipments, such as mailing- or shipping-related articles and wrappers; general supplies, such as baggies or other storage containers; and other implements, such as scales, and "tools of the trade," such as firearms.

I conclude, accordingly, that the affidavits, though far from models of clarity, do show probable cause both as to the defendant's drug-related crimes and the premises, the search of which the warrant authorized.

### 2. Particularization

The Fourth Amendment requires that warrants particularly describ[e] . . . the things to be seized." Among the Amendment's purposes was to curtail open-ended, free-wheeling searches under the authority of general warrants. *E.g,, Stanford v. State of Tex.*, 379 U.S. 476, 480 (1965).

At issue here is whether a warrant meets this mandate where it is a veritable shopping list of just about everything a drug detective might want to find on the shelves or the counters, or in the cupboards and closets, and other places, open or concealed, where a drug dealer operates, keeps inventory and tools of the trade, and has paper or digital ledgers.

Though that list is very broad and depends on general truths about drug dealers and their habits, rather than first- or even second- or third-hand direct knowledge, courts in our Circuit have upheld, to use their terms, warrants with a "laundry list" of the things to be seized.

In one of these cases, *United States v. Hollis*, 2017 WL 1382921 (W.D.Ky., 2017) (Russell, J.), the court applied an analytical template that I adopt:

> The degree of specificity required in a warrant varies depending on: (1) what information is reasonably available to the authorities, *United States v. Hanna*, 661 F.3d 271, 286–87 (6th Cir. 2011), (2) the nature of the "crime involved," as well as (3) the "types of items sought." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (quoting *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001)).

*Id.* at *5.

In that case, the court observed, as I can here with regard to the Tiffin Avenue location, that the "officers suspected, on good authority, that [the defendant] was using the [premises] as a 'stash house' for drugs, firearms, and cash." *Id.* Here, too, as there, the "agents had no idea how [the defendant] stored, prepared, and packaged the drugs, or where and in what form he kept records of his transactions." *Id.* Indeed, as in *United States v. Raglin*, 663 Fed.Appx. 409, 412 (6th Cir. 2016), "[a]ll the officers had to go on was the well-substantiated suspicion that there was drug trafficking afoot" on the premises the warrants authorized them to search. "In circumstances such as these, there was not much more Detective [Brotherton] could have included than what he did: that the officers were looking for evidence of drug trafficking." *Hollis, supra,* 2017 WL 1382921, at *5.

In addition to the officers' sparse foreknowledge, the court in *Hollis* considered the nature of the defendant's crime, which, like Grant's, involved drug trafficking. As the court there noted, drug trafficking "is a crime that often generates the same distinctive evidence from case to case." *Id.* at *6 (citing *United States v. Martin*, 920 F.2d 393, 399 n.7 (6th Cir. 1990) ("chemicals, money, firearms, records, ledgers, beepers, scales, telephone numbers, a variety of common household items and related narcotic paraphernalia")).

7

The court in *Hollis* next noted that "the types of things sought…(crystal methamphetamine, drug paraphernalia, and weapons) amount[ed] to nothing more than contraband and, as such, required no detailed description." 2017 WL 1382921, at *6 (citing *United States v. Campbell*, 256 F.3d 381, 389 (6th Cir. 2001) ("If the purpose of the warrant is to seize illicit property or contraband, however, a general reference is permissible."), *abrogated on other grounds by Begay v. United States*, 553 U.S. 137 (2008), *as recognized in United States v. Evans*, 378 Fed.Appx. 485, 489 n.5 (6th Cir. 2010)).

Other drug cases in our Circuit likewise referring to "laundry lists" of things to be seized have come to the same conclusion as to particularization. *United States v. Dawson*, 2019 WL 7546628, at *4–7 (N.D.Ohio, 2019) (Bachman, J.); *United States v. Howard,* 2014 WL 1253123, at *3 (E.D. Ky. 2014) (Caldwell, C.J.).

In sum, in our Circuit, drug cases appear to be somewhat *sui generis* when it comes to the particularity requirement. *See United States v. Lengen*, 245 Fed.Appx. 426, 433 (6th Cir. 2007) ("[b]ecause of the very nature of contraband drugs and any drug-trafficking operation, a warrant cannot be expected to identify exactly the weights or quantities of controlled substances and paraphernalia that might be found in a private dwelling."); *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir.1991) ("If the purpose of the warrant is to seize illicit property or contraband, however, a general reference is permissible.").

Given this authority and approach, I conclude that, despite its nearly limitless expansiveness and scope, the warrant adequately denominated "the things to be seized."

## Conclusion

I conclude, on the basis of prevailing law, as the court did in *Hollis,* that, "[v]iewed in context, therefore, the use of a seemingly generic list does not fall short of the Fourth Amendment's

demand for particularity." 2017 WL 1382921, at *6 (citing *United States v. Willoughby*, 742 F.3d 229, 233 (6th Cir. 2014) (holding that "broad list of items" was sufficiently particular where "a global modifier" limited the scope of the search "to a list of offenses for which there was probable cause to think [the defendant] had committed")).

I close with the observation that none of this was necessary.

Not this opinion. Not the hours in this case, *Swain,* and *Nicholson* various AUSAs and defense attorneys spent on motions to suppress and briefs. Not the suppression hearing in this case. And not, certainly, for the government, the risk of loss.

None of all that would, in all likelihood, have happened had the DEA Agents who participated in the underlying investigation in these cases done the right thing: taken the far less time needed to have an AUSA work with them to prepare a far more sound, far more succinct and comprehensible, and (far more likely) challenge-proof series of affidavits and warrants for the Magistrate Judge to review and sign.

Some well-known, time worn, but time-prove adages come to mind: A stitch in time saves nine. Better safe than sorry. A job worth doing is worth doing well.

It is hereby

ORDERED THAT the defendant's motion to suppress (Doc. 20) be, and the same hereby is denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge